Filed 6/21/16 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL ANGEL ALEMAN et al.,<br><br>    Defendants and Appellants. | B249467<br><br>(Los Angeles County<br>Super. Ct. No. BA394747)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br><br>**[No Change in Judgment]** |

THE COURT:

It is ordered that the opinion filed herein on May 23, 2016, be modified as follows:

1.    Page 1:  insert the superior court case No. BA394747 below the appellate case number.

2.    Page 25:  first sentence of the second full paragraph under heading No. 2, substitute the word "use" for "introduce" and, at the end of the sentence, add as footnote 5 the following footnote, which will require renumbering of all subsequent footnotes.  The sentence and accompanying footnote now read as follows:

> Aleman's attorney asked the court for permission to use the Letter because "it is relevant and material with respect to [Cabral's] credibility."[5]
>
>    [5]  It was unclear, at this point, whether the defense planned to introduce the Letter into evidence, or only use it to impeach Cabral.  It was only after extensive examination by the defense that the prosecution moved to introduce the Letter.

3.    Page 25:  last line on the page, substitute the word "use" for "introduce" so that the phrase now reads:  The court allowed the defense to use the Letter . . . .

4.      Page 26: delete the last sentence of first full paragraph and insert the following sentence in its place:  In an attempt at impeachment, the defense extensively interrogated Cabral about the Letter.

5.      Page 27, footnote 6 [now footnote 7], last line of the footnote, insert quotation marks around the word "introduce."  The sentence now reads as follows:

> The record belies defendants' current disavowal of responsibility for convincing the trial court to "introduce" the Letter.

6.      Page 28, first sentence of the second full paragraph, substitute the words "that they could use" for "to introduce," so that the sentence reads as follows:

> Once defendants convinced the trial court that they could use the Letter, the court properly found that all of it was admissible under the doctrine of completeness.

7.      Page 28, third sentence of the second full paragraph, substitute the word "used" for "introduced" so that the sentence reads as follows:

> Defendants used the Letter to show that Cabral was lying to obtain leniency.

This modification does not effect a change in judgment.

Appellant Andy Medrano's petition for rehearing is denied.

Filed 5/23/16 (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B249467 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA394747 ) |
| v. | |
| MICHAEL ANGEL ALEMAN et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County. Cynthia L. Ulfig, Judge.  Affirmed.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant Michael Angel Aleman.

Law Offices of Dennis A. Fischer, Dennis A. Fischer for Defendant and Appellant Andy Medrano.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael C. Keller and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Michael Angel Aleman and Andy Medrano were convicted of first degree murder and other criminal offenses. We find no reversible error and affirm.

## FACTS

### The February 2008 Shooting of Victor Iriarte[1]

On February 23, 2008, Victor Iriarte went to El Rodeo nightclub in Pico Rivera with his brother and two friends, including Jose Macias. Defendant Aleman and his friend, defendant Medrano, were also at the nightclub. Iriarte recognized defendants. A woman who briefly dated Aleman told police that Aleman and his friends got into fights at El Rodeo with friends of prominent "big shot" Macias.

Iriarte was tipsy when he arrived at El Rodeo, and proceeded to drink eight or nine glasses of liquor while there. He departed at closing time in a friend's Camaro. Three to five gunshots were fired at the Camaro, one of which struck Iriarte. He was hospitalized for a grazing bullet wound to his chest, inches from his heart. Iriarte told detectives that a white SUV was driving near the driver's side of the Camaro when the shooting began. At trial, Iriarte claimed little memory about the incident, and was reluctant to testify.

At 2:11 a.m. on February 23, 2008, police received a call about a shooting involving a white Escalade in the City of Montebello, one mile from El Rodeo nightclub. Minutes later, police stopped a white Escalade at a red light. Aleman was in the driver's seat. Medrano was a passenger.

The six individuals in the Escalade were taken to the police station. Their hands were not protected in bags, nor were they prevented from washing or wiping their hands in their jail cells. At around 4:00 on the morning of the shooting, gunshot residue tests were performed at the Montebello jail as an afterthought by the local police. Aleman's test revealed lead particles; tests done on Medrano and the four other passengers showed lead and antimony, increasing the likelihood that a gun was fired nearby.

---

[1] We are using Iriarte's spelling of his last name at trial.

2

A search of the Escalade uncovered a Ruger nine-millimeter semiautomatic gun on the floorboard in the front console, with a chambered live round and three more in the magazine. Three spent casings from the Ruger were found, on the driver's floorboard, on the front passenger seat, and on the rear floorboard. The bullets and casings were manufactured by Winchester. In May 2008, after the Iriarte shooting, a friend riding with Aleman saw a nine-millimeter semiautomatic gun in the glove compartment of Aleman's car.

One of the passengers in Aleman's car was Laura Nunez, who gave birth to Aleman's child in 2009. Nunez waived her *Miranda* rights and spoke to the police that morning. She was nervous and scared during her interview. Nunez told police that she and Aleman went to El Rodeo in his white Escalade and departed with their friends at closing time, 2:00 a.m.

Aleman drove along the street, with the windows rolled down. Nunez told police that she heard two to three gunshots fired from inside the Escalade. The noise was "so loud that her ears were numb." She instinctively hid on the floor. Immediately after, she saw Aleman with a gun in his hand, placing it near the center console. Nunez conceded at trial that Aleman could have been firing a gun over her head.

At trial, Nunez denied telling detectives that Aleman placed a handgun near the center console area immediately after the shooting, or that somebody was shooting from within the Escalade. She agreed that the shots were "very loud" and her "ears were numb from the sound." After shots were fired, Aleman drove away "somewhat fast." When the police pulled them over, the men in the Escalade said, "Don't say shit." Nunez understood that to be a warning not to talk to the police.

Another passenger in Aleman's Escalade that morning was Sabino Cabral. Cabral met his friends Aleman and Medrano at El Rodeo. They left at closing time. Cabral had consumed at least 10 whiskeys at the nightclub, and was so drunk that he passed out on the floor behind the second row of seats. He heard no gunshots and was awakened by police sirens. Aleman bailed Cabral out of jail, after they were arrested.

## The December 2008 Shooting of Jose Macias

Early on December 12, 2008, a motorist surnamed Ocampo developed transmission problems in downtown Los Angeles and was waiting in his car on Alameda for a tow truck. Around 3:00 a.m., he observed a silver Bentley, driven by a young Latino man, playing very loud music. The car went south on Alameda, made a U-turn, and stopped at a red light at the intersection of Alameda and Cesar Chavez, three to four car lengths from Ocampo.

Two Hispanic men—a tall one wearing a gray hooded sweatshirt and a short, robust one—approached the passenger side of the Bentley on foot and began shooting into it, two to four gunshots per gun in quick succession from automatic weapons. Ocampo saw muzzle flashes. The Bentley drove north on Alameda after the shots were fired, then made a U-turn and headed south on Alameda.

Police presented Ocampo with a six-pack photographic lineup in January 2009. He selected photographs of Aleman and one other person as "most similar" to the taller of the two shooters. At the preliminary hearing and at trial, Ocampo made an in-court identification of Aleman as being similar to the taller shooter that Ocampo was able to see in profile, firing a gun.

At 3:24 a.m., the California Highway Patrol received a call about gunshots and a collision. Officers arrived within a few minutes and found a silver Bentley stopped on the southbound 101 freeway, near the Mission Road exit in downtown Los Angeles, with its left wheels up against the curb at the center divider. The driver was slumped over, his head between the steering wheel and the car door. There were three bullet holes in the front passenger window, and 15 to 20 bullet holes on the passenger's side of the vehicle, some of which had a downward trajectory as if fired from a higher profile vehicle. The victim was gasping for air and blood was pouring from a bullet hole in the back of his head. There was a copious amount of blood on the door and floorboards.

The injured driver, 25-year-old Jose Macias, had minimal brain function when he arrived at the hospital, with a gunshot wound in the back of his skull. There was no chance of recovery. He died on December 14, 2008. The coroner recovered bullet

4

fragments and a deformed copper jacket from Macias's brain. The injury was not caused by a gunshot fired from close proximity.

Police found no guns or knives in Macias's car. Eight spent nine-millimeter bullet casings stamped "CCI" for a nine-millimeter Luger firearm were found on the freeway nearby, all fired by the same semiautomatic weapon. Bullets and bullet fragments consistent with the same caliber firearm were found inside the Bentley. Police found nine-millimeter Luger bullet casings made by Winchester at the corner of Cesar Chavez and Alameda, where Ocampo saw two men shoot at the Bentley.

Macias's car crashed on the freeway two miles (and five minutes by car) from Placita Olivera, where a church parade began at midnight. Ocampo indicated that the religious festival is about 100 steps from the shooting site at Cesar Chavez and Alameda. At around midnight, a festivalgoer took photographs of Aleman (wearing a gray hooded sweatshirt) standing next to festival performer Roberto Tapia. The photographer, who does not know Aleman, posted her pictures online, and was contacted by detectives investigating the shooting.[2]

Sabino Cabral, defendants' friend who was in Aleman's Escalade on the night of the Iriarte shooting, had arranged to meet defendants at the church festival at Placita Olivera. Cabral hung out and partied with defendants nearly every day in 2008 and early 2009. After picking up his friends Richard and Marlene Moreno, Cabral drove to the post office parking lot at Cesar Chavez and Alameda. There, he and the Morenos met up with defendants, and they walked to Placita Olivera together.

Medrano told Cabral that he and Macias got into a fight during the festival, which was broken up by security guards. Around 2:30 a.m., Cabral and the Morenos walked back to Cabral's car. Defendants left at the same time, and reached the intersection of Cesar Chavez and Alameda before Cabral and the Morenos. A passing Bentley caught Cabral's and the Morenos' attention.

---

[2]      The jury was advised that Aleman's mother followed this witness into a restroom during trial, just as the witness was about to testify, and intimidated her.

Richard Moreno saw defendants standing at the intersection with Roberto Tapia. The Morenos heard defendants exchange words or argue with the Bentley driver, who pulled away then made a U-turn. When the Bentley stopped, the Morenos and Cabral heard three to six gunshots fired nearby, causing them to drop to the ground, then run away. Defendants did not run. When Cabral returned to his parked car, he saw defendants and Chris Medina getting into Medrano's Dodge Ram truck.

Medrano drove out of the parking lot onto Cesar Chavez, then headed south on Alameda, following the Bentley. Cabral was also in his car, driving south on Alameda. As the cars entered the 101 freeway, Cabral saw muzzle flashes from the driver's side of Medrano's truck, aimed at the Bentley. Cabral saw the Bentley pull into the center divider. Cabral left the freeway at Mission (the next exit) and drove the Morenos home.

Richard Moreno recalled that Cabral got on a freeway for the five- to 10-minute drive home. From the back seat of Cabral's car, Moreno did not see the Bentley or muzzle flashes, but he was not paying attention. He felt "paranoid" owing to the gunfire near the festival. He did not see Cabral with a gun at any point that evening. Marlene Moreno was slouching or ducking in the front seat: she was "scared" and "panick[ed]." She paid no attention and did not see anything happen on the freeway.

Cabral received a cell phone call from Aleman, who asked Cabral to drive up the 101 freeway "to see what happened" to the Bentley. Cabral returned to the site, 20 minutes after he saw shots fired, and called Aleman to report that the Bentley had crashed. Later that day, Aleman asked a friend to check online to see whether the police had named any suspects in the Macias shooting.

After the shooting, Cabral had dinner with defendants and others, at Aleman's request. After inquiring whether Cabral had heard what happened, Medrano, bragging, said "that he had done the shooting." Aleman loudly told Medrano "to shut the fuck up."

Cabral knew victim Macias as "Huerito," and told detectives that Medrano "had a beef with Huerito." In fact, "they all had a beef with Huerito," referring to Aleman, Medrano and Chris Medina. Cabral learned this from hanging out with them. Cabral

6

told detectives that Medrano fought with Huerito at the festival, and one of Huerito's friends pulled a gun on Medrano.

Cabral expressed fear that "I could get killed for my testimony." He initially lied to police investigators in June 2009, falsely telling them that he was not at Placita Olivera and knew nothing about the freeway shooting. He did not want to get involved, reasoning that "it could cost me my life." The police showed Cabral photographs depicting him, Medrano and Chris Medina together before the shooting, and told him to stop lying. They also had cell phone records placing Cabral at the location of the shooting. Cabral admitted during his police interview that "Mike, Andy and Chris" shot at Macias, and Medrano bragged about it.

Mobile telephone records showed that Aleman's device was activated near Placita Olivera at 12:24 a.m. on December 12, 2008, around the same time as Cabral's device. The two communicated numerous times between 3:18 and 3:45 a.m., using cell phone towers near the Bentley crash site. Cabral cooperated with police because he wanted to avoid being charged with Macias's murder or spend the rest of his life in prison.

A woman who dated Aleman for several months in 2008 testified that defendants and their friends hung out at El Rodeo nightclub. Aleman's group had conflicts with Huerito (Macias). In 2009, the witness told investigators that she saw them fighting at the club, which she denied at trial.

### Defendants' Arrests

After gleaning information about the Macias shooting from Cabral, the police conducted surveillance on Aleman. He responded by staying in hotels, not at home. On June 30, 2009, while under surveillance, Aleman went to a Best Western hotel. Half an hour later, he departed from the hotel and drove south on Interstate 5 with Brenda Aguirre. They were stopped in San Clemente. Police removed cell phones and a receipt for a self-storage unit from Aleman's car. In the hotel room registered to Aleman, the police found a suitcase containing a cell phone; Aguirre's birth certificate, U.S. visa and Social Security cards; Gina Acosta's driver's license; men's clothing and other items.

The court did not allow the jury to hear that the police found $100,000 in the trunk of Aleman's car.

In October 2009, Medrano was pulled over for using a telephone while driving. He had no driver's license and identified himself as "Rigoberto Gonzalez" (the owner of the car). When asked his date of birth, Medrano looked confused and had to make a telephone call to find out the answer. The officer inquired what Medrano's true name is, and Medrano replied, "Mario Hernandez." He was arrested for driving without a license and giving false information to the police. During booking, officers discovered that Medrano was wanted in a murder investigation. While in jail, Medrano was recorded telling a cellmate, "I'm a drug dealer. . . . For real, fool."

## PROCEDURAL HISTORY

Defendants were charged in an eight-count amended information. They pleaded not guilty. Trial was by jury. It was stipulated that Aleman has a prior felony conviction for voluntary manslaughter.

Following a three-month trial, Aleman and Medrano were both convicted of the first degree murder of Jose Macias and of shooting at an occupied motor vehicle. (Pen. Code, §§ 187, subd. (a), 246.)[3] Aleman was convicted of the attempted murders of Macias and Victor Iriarte (or other person in the vehicle) (§§ 664/187, subd. (a)); three counts of possession of a firearm by a felon (§ 12021, subd. (a)(1)); and assault with a semiautomatic firearm (§ 245, subd. (b)). The court found true that Aleman has two prior convictions for assault with a firearm.

Aleman was sentenced to an indeterminate term of 165 years to life, plus a consecutive determinate term of 12 years. Medrano was sentenced to 50 years to life. They appeal.

---

**3**      All unlabeled statutory references in this opinion are to the Penal Code.

8

## 1. Jury Selection

Citing *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), Medrano contends that the prosecution, motivated by group bias, removed six prospective jurors by the improper exercise of peremptory challenges.

a. *General Principles*

"The prosecution's use of peremptory challenges to remove prospective jurors based on group bias, such as race or ethnicity, violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution and his right to equal protection under the Fourteenth Amendment to the United States Constitution." (*People v. Blacksher* (2011) 52 Cal.4th 769, 801.)

"A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination." (*People v. Manibusan* (2013) 58 Cal.4th 40, 75.) "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613.)

A prosecutor must provide a clear and reasonably specific explanation of legitimate reasons for exercising a challenge. (*Batson*, *supra*, 476 U.S. at p. 98, fn. 20.) "The justification need not support a challenge for *cause*, and even a 'trivial' reason, if genuine and neutral, will suffice." (*People v. Arias* (1996) 13 Cal.4th 92, 136, italics added.) A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. (See *People v. Turner* (1994) 8

9

Cal.4th 137, 165; *Wheeler*, *supra*, 22 Cal.3d at p. 275.) Although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection. (*Purkett v. Elem* (1995) 514 U.S. 766, 769.) "Certainly a challenge based on racial prejudice would not be supported by a legitimate reason." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613.)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' (*Miller-El I* [*v. Cockrell* (2003)] 537 U.S. [322,] 339.) In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. (See *Wheeler*, *supra,* 22 Cal.3d at p. 281.)" (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613, fn. omitted.)

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613.) "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges '"with great restraint."' [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 864.)

b. *The* Wheeler/Batson *Motions*

The prosecution's first two peremptory challenges drew a *Wheeler/Batson* motion from the defense. The prosecution's first challenge was to prospective Juror No. 7361, a Hispanic woman, and the second challenge was to prospective Juror No. 8532, an

10

African-American woman. The court noted that the venire had only three or four African-Americans, but a large number of Hispanics.

(1) Prospective Juror No. 8532

Juror No. 8532, an African-American female, was a mortgage banker married to a chef. They had two children aged 19 and 21, both students. Juror No. 8532 had prior jury experience some 12 years earlier. When asked what the case involved, she replied, "It was domestic violence. The wife was getting abused by her husband, and she shot him." After a three-week trial, the jury had reached a verdict. Juror No. 8532 stated that nothing about that case affected her ability to be fair and impartial in the instant case. The court ruled that the defense had "stated sufficient grounds for the People to explain the reason for the dismissal of prospective Juror [ ] No. 8352."

The prosecutor began his explanation by saying that "this particular juror that was on a prior jury, which was possibly an attempted murder, I believe she characterized the defendant as a victim in that case and that her husband was beating her. And that the husband had a gun, that there was a scuffle between them, and then the gun went off accidentally. When I clarified, if the female was the victim or the defendant, she made it clear that she was the defendant. So her opinion in that particular case was that it was an accidental shooting, and there was a verdict in that case. And that that verdict, in my opinion, by what she described, was an acquittal." The prosecutor stated that the instant case involved a serious violent crime and "this juror is already of the mindset where the prosecution does not necessarily always present the truth. They may present cases . . . where the evidence is not going to show that an individual is guilty. I believe that makes her sympathetic to the defense and possibly biased against the prosecution." The prosecutor added that "she also has a brother that was arrested 15 years ago." The prosecutor concluded that prospective Juror No. 8532 was "not a good juror for the People. . . . She has already, in my opinion, acquitted someone of a serious charge. And I believe that that particular case was an accidental shooting."

The court ruled that the prosecutor had stated race-neutral grounds. The court noted that while people are "vague about their jury experience" one would think that

11

"you'd know the difference, whether someone was a defendant or a victim on a trial you sat on." Medrano argues that Juror No. 8532 never characterized the defendant in the prior case as "a victim" and the court relied on the prosecutor's misstatement of the record. Thus, Medrano reasons, since the record was not reliable, the trial court's ruling is not entitled to any particular deference.

Whether Juror No. 8532 did or did not refer to the defendant in the prior case as a victim is of little moment. The prosecutor challenged the juror because she was inclined to favor the defense. Her defense bias was suggested by her vote to acquit in the previous case. Compared to her vote to acquit, it is relatively unimportant how she referred to the defendant in that case.

The question in this court is whether substantial evidence supports a denial of the *Wheeler/Batson* motion as to Juror No. 8532. There is such evidence. The prosecutor made it quite clear that it was not only the juror's vote to acquit but also how she saw that case that caused him to challenge her. She referred to the case as one of domestic violence where a scuffle had led to an accidental shooting and where it was the victim who had been originally armed. That is not how a prosecutor would like to see an attempted murder prosecution described. All of the foregoing are facts and matters of record. This does not require us to defer to the trial court, it only requires that we acknowledge the undisputed fact that Juror No. 8532 voted to acquit a defendant in what appears to have been an attempted murder prosecution. From the prosecution's perspective, a peremptory challenge was almost a foregone conclusion. The challenge was very clearly race neutral and conformed to *Wheeler/Batson* standards.

We make an observation here that applies throughout: The prosecution's challenge need not be based on a grounds that we approve of. Some may find it objectionable or even offensive for a prosecutor to remove a person because he or she voted to acquit in a previous case; such a reason may not pass muster on a challenge for cause. However, a peremptory challenge may be based on an idiosyncratic or arbitrary reason, and even on a hunch. (*People v. Turner*, *supra*, 8 Cal.4th at p. 165.) The question is whether the challenge was based on group bias, such as on race or ethnicity,

12

and therefore violated the equal protection clauses of the federal and state Constitutions. If there was no group bias, the peremptory challenge will stand.

(2) Prospective Juror No. 7361

The parties are divided on whether the court found a prima facie case regarding Juror No. 7361. We will assume that a prima facie showing triggered an explanation from the prosecutor. The record shows that the court did direct the prosecutor to address the matter of Juror No. 7361.

Juror No. 7361, a resident of Granada Hills, was single, had no children, and worked as a supervisor in a retail store. She had been a victim of identity theft but the person who stole her information was caught and she was able to get her credit cleared; she did not have to testify in court. Her sister had been booked for "DUI" about a year earlier, but Juror No. 7361 did not go to court on her sister's behalf and had no opinion about how the sister was treated by the court system. Juror No. 7361 informed the court that she was pregnant and had a group appointment once a month on a Friday that could not be changed. The prosecution was willing to stipulate to excuse this juror, but defense counsel noted she had unlimited pay and could therefore stay for a long time, and the court felt that they could work around the juror's schedule.

The prosecutor offered this explanation for his peremptory challenge: "7361, she's a lady that has indicated to the court during the hardship that she's pregnant, and she has an appointment that she has to attend to. And I have a witness in this particular case, Gina Acosta, who is pregnant. Because she's uncooperative, I had to place her in custody while pregnant. I feel if this [juror] learns that that's happened in this case, she will feel some sympathy or bias against me for having placed a pregnant woman like herself in custody. She has also had a sister who, within the last year, was charged and convicted of a DUI here in L.A. County. And that could have been the same type of prosecutor as myself that prosecuted her sister. And I believe she also said that she had a negative experience with a police officer in the past. I did not ask her what that experience was, because I didn't want that to be voiced in front of the jurors. Those are my reasons. They have nothing to do with her race."

13

The court noted that Juror No. 7361 had raised the matter of her pregnancy; however, the challenge was based not on her pregnancy but on "the sympathy factor towards the witness." The court concluded the challenge was race neutral.

Medrano contends that the reasons given by the prosecutor "are totally at odds with the record and have no plausibility." In making this argument, Medrano seems to think that the prosecutor is required to deliver a compelling, factually unimpeachable case against a prospective juror when exercising a peremptory challenge. That, of course, is not the case. "A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons." (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613.) Even a trivial reason, if genuine and neutral, will suffice. (*Ibid.*)

The reason given by the prosecutor was neither idiosyncratic nor trivial. There is no dispute that witness Acosta was pregnant and in custody. While it may well have been true, as Medrano claims, that Acosta would no longer be pregnant when she testified, there is nothing that required the prosecutor to gamble that it would not somehow become known that he had imprisoned an expectant mother for no reason other than that he needed her testimony. Not every person, man or woman, could be expected to pass lightly over this fact. The incarceration of witness Acosta and its potential impact on the prosecution's case is substantial evidence that supports the court's ruling. It is also true that the explanation is race neutral.

We do not need to address Medrano's complaint that the court did not have the facts straight when it remarked that the juror asked to be excused because of her pregnancy. It is true that Juror No. 7361 made no such request. Yet, the court's ruling was not based on obstacles posed by the juror's pregnancy but on the incarceration of Acosta. The court's mistaken recollection about a fact that had nothing to do with its ruling is simply not material.

(3) Prospective Juror No. 4093

Juror No. 4093, a Hispanic woman, lived in Canyon Country and worked as an account specialist at Bank of America. She had two children, ages seven and 10 months.

14

When asked the occupation of the children's father, Juror No. 4093 said he was unemployed; she did not identify him as her husband. Neither she nor anyone close to her had ever been the victim of a crime or arrested for a crime. She knew of no reason why she could not be a fair and impartial juror.

The prosecutor explained his peremptory challenge to Juror No. 4093: she "is a young female who on September 21st was late, kept all jurors late. I think she is young. She has never been on a prior jury service. [I]n this particular case, I don't think she has life experience that's necessary to render a verdict or decide who is telling the truth between the witnesses we are going have here. She doesn't have the kind of experience that other jurors have. [W]hen the court asked her about her husband, she said that he was unemployed. What did he do in the past? He was unemployed. [Defense counsel]: She doesn't have a husband. [Prosecutor]: She has two children from a particular individual who has been unemployed all the time. I thought that was interesting. Given the fact that I think we may have—women about her age that are dealing with these defendants and they may, you know, make excuses. They will probably come here, make excuses for these defendants, why they associate with them and recant for them, and I don't know, this woman—I'm not saying she would, but she may make excuses for her past relationship, but given all those factors, she is a questionable juror to me. She is not a—does not appear to be a conservative juror, does not appear to have the type of experiences I would want when deciding credibility, so many witnesses and so much evidence in this case given the other jurors on this jury."

The court rejected the *Wheeler/Batson* motion: "the court finds this is a race-neutral determination by the People. Again, these are peremptory challenges, these are not motions for cause. The People, just as [the] defense, [have] the right to choose the jury they feel is appropriate to hear the case. We do not have to take the first 12 because we could have started three weeks ago, if that were the case. In this case, the People have explained reasons for their request for the dismissal of this particular juror."

15

Medrano contends that the "pretextual nature of the People's explanations in light of the record is manifest" and goes on to claim that *People v. Gonzales* (2008) 165 Cal.App.4th 620 (*Gonzales*) is "[c]losely in point."

*Gonzales* actually demonstrates that the explanation given in the case at bar was credible. In *Gonzales*, the sum total of the prosecutor's explanation was that prospective Juror J.C. was (1) young; (2) had no significant ties such as spouse or children; (3) did not have the qualities the prosecutor was looking for in a juror (without stating what those qualities were); and (4) he spoke Spanish, which would have caused difficulties because interpreters were going to be used. (*Gonzales*, at p. 624.) Given that there was nothing in the record to support that J.C. lacked significant ties to a spouse or children (*id.* at p. 631), this reduced the reasons to: (1) J.C. was young; (2) he lacked unspecified qualities of a juror; and (3) he spoke Spanish. *Gonzales* concluded that the challenge to J.C. was a violation of *Wheeler/Batson*. (*Id.* at p. 632.)

In the case at bar, the prosecutor explained that Juror No. 4093: (1) was young; (2) had not served on a jury before; (3) lacked life experience; (4) lacked the experience of other jurors; (5) might sympathize with women in this case who would make excuses for the young defendants in this case since the father of her children was unemployed and was not her husband; (6) was not conservative; (7) did not seem to have the experience required to pass on credibility; and (8) had been late to court and had kept all the other prospective jurors waiting.

The comparison between *Gonzales* and the explanation regarding Juror No. 4093 could not be more telling. The prosecutor was concerned that Juror No. 4093's attitude might be too permissive (she might make excuses), given that she was not married to the unemployed father of her children. That is certainly a solid concern based on facts of record, even if some might privately bridle at socially stigmatizing an unwed mother— but then jury selection is not a parlor game. The prosecutor also found Juror No. 4093 not to be conservative, a valid consideration in any criminal trial. These factors, when tied together, weigh in favor of challenging the juror. And then there was her tardiness to court, also undisputed, which began to draw the picture of a person that most prosecutors

16

would not wish to see on a jury. The trial court's statement that the parties are entitled "to choose the jury they feel is appropriate to hear the case" seems to be an acknowledgment that the prosecutor was in a sense socially stigmatizing Juror No. 4093, but that was something both sides were entitled to do in the selection of the jury.

We cannot agree with Medrano that the prosecutor's explanation of the challenge to Juror No. 4093 was "rank speculation, neither plausible nor supported by the record." That Juror No. 4093 had two children, was not married, that the father of the children was unemployed, that she had no prior jury services, that she was late to court, were all facts of record. The prosecutor's conclusions—reached, as is inevitable in these situations, on the fly with little time for reflection—were in fact quite plausible. If an unmarried parent of two is late to court, this can arguably, even if ungenerously, be seen as a lack of maturity or, as the prosecutor put it, as a lack of life experiences.

We conclude that the denial of the defense motion as to Juror No. 4093 did not violate *Wheeler/Batson* principles.

### (4) Prospective Juror No. 9944

This prospective juror, also a Hispanic woman, lived in North Hills, was a student, was single and lived with her parents. She had no prior jury experience. She was attending ITT Tech at night in "produce management," having earlier completed her associate degree in "Criminal Justice." Juror No. 9944 reported that her father had been arrested for a DUI about two and one-half years earlier, and thought he had pleaded guilty. She had no opinion about how the officers or court system treated him. She said she could be fair to both sides.

Under examination by the prosecutor, Juror No. 9944 stated that she had taken a number of classes in criminal justice, including one in criminal law. When asked whether she would set aside what she learned in class and follow the court's instructions if selected as a juror, she answered "yes."

In explaining his challenge to Juror No. 9944, the prosecutor stated there were at least four Hispanic jurors on the panel and that this particular juror "is a young college student that doesn't have the life experiences that I would want from a juror in this case.

17

She is dressed very casually, not today but the two prior occasions that I have noticed her." The prosecutor noted that the juror had studied criminal justice "so she has some type of understanding of criminal law that may be different than what we end up explaining here. I don't know if that may be true or not, I don't want to take the risk with this young juror if she disagrees with anything that we do in this particular case." The prosecutor closed by observing that the prospective juror had no prior jury experience, lived with her parents, and did not seem to have the "life experiences that I would like to have in a juror who is going to judge credibility of people that are much older than her and probably much more sophisticated than her in doing certain things." He also noted that her father had been prosecuted for a driving under the influence offense within the last two and a half years.

The court denied the *Wheeler/Batson* motion as to Juror No. 9944: "[T]he court was a bit concerned, as well, with the—fact she has criminal justice background. Sometimes a little knowledge is a very dangerous thing. And I have concern that she would [] discuss the matter with her law professors and people at school, and I do feel that the People have established this was a race-neutral ground for her removal. And she will be permitted to be removed over the objection of the defense."

We begin with the rather obvious point that allowing anyone with legal training to serve on a jury is a calculated risk. While from time to time, trial counsel will for some good reason decide to run that risk, some think that a trial lawyer should opt for safety and remove a person with legal training from the venire.

Given her youth, Juror No. 9944 was already marginal, at least in the prosecutor's opinion. There were other factors, such as her father's DUI, that made Juror No. 9944 a doubtful choice for the panel. She offered nothing but negatives. Thus, there was no reason to depart from the usual practice of removing a law-trained person (half-trained, at that) from the venire.

With this background in mind, we find no fault in the trial court's ruling denying the *Wheeler/Batson* motion. The ruling was based on an undisputed fact, which was Juror No. 9944's legal training. The prosecutor's statement that he did not "want to take

18

the risk with this young juror if she disagrees with anything that we do in this particular case" is right out of the playbook of any competent trial lawyer.

Medrano takes issue with the court's observation that she might discuss the case with her instructors, since no one had suggested this possibility. The observation does not impugn the decision of the prosecutor to exercise a peremptory challenge because he did not want to run the risk of a law-trained person on the panel. Medrano contends that because Juror No. 9944 repeatedly assured the questioner that she would follow the court's instructions on the law, it was "groundless speculation" that she might, in fact, do the exact opposite. The answer is that, sadly enough, common experience renders such an outcome neither groundless nor speculative, but a possibility to be guarded against.

(5) Prospective Juror No. 5475

Juror No. 5475, an African-American female, lived in Canyon Country, was engaged to be married, and worked as a bank teller. She had three children, aged 13, 9 and 7 years. Her fiancé was a warehouse manager; the father of her children had been a medical biller. Neither she nor anyone close to her had ever been a victim of a crime. She had never testified in court. She affirmed she could be fair to all sides. When questioned by defendant Aleman's counsel, Juror No. 5475 answered "yes" when asked if she could apply the presumption of innocence.

While questioning Juror No. 5475, the prosecutor stated that it was desirable in a juror to change his or her mind if he or she concluded that he or she had made a mistake. He asked Juror No. 5475 if she was willing to do that. Juror No. 5475 answered that she was willing to do that because she "definitely want to be absolutely sure of my decision." The following transpired: "[Prosecutor]: Now, when you say absolutely sure of your decision— [Juror No. 5475]: Sure as the evidence that was presented to me and everyone coming together with their thoughts and coming with a decision, I want to be sure within myself that I came to the right decision. [Prosecutor]: And you will hold us to the standard of proof beyond a reasonable doubt? [Juror No. 5475]: Yes, I will."

Regarding Juror No. 5475, there was more than just a motion under *Wheeler/Batson*: the defense moved for a mistrial following the prosecution's

19

peremptory challenge. Defense counsel claimed that the prosecution was "removing every ethnic minority" and that the venire had begun to laugh as the prosecution was removing minorities. The court stated that it was not sure why the prospective jurors were laughing and that it would not speculate as to why there was laughter. The court then gave the floor to the prosecution.

The prosecutor commenced by saying that Medrano's attorney was visibly reacting to every peremptory challenge to a minority and the jury was watching him every time such a challenge was made. The prosecutor thought that this was what the laughter was about. The prosecutor then addressed the challenge: "Juror No. [5475] is the juror that I asked about the standard of beyond a reasonable doubt and if she would be able to convict. She said if you absolutely prove it, and I had to explain to her that the requirement is not that I absolutely prove it, it's that I prove it beyond a reasonable doubt. And this is a standard that's used in all criminal cases. She also used the word 'correct,' if the evidence is correct. It's not so much the answers that are reflected in the record, it's her demeanor and the way she says things. When a juror is telling me that she needs for something to be proven absolutely, I don't care if they are White, Hispanic, whatever race. That's a juror that I think may have difficulty with this case at the end of it. I may need more evidence than I may have in a particular case. So it's the language that she's using to indicate what level of evidence I need in this particular case. So whether she would have been White, Hispanic, with that type of terminology and those type of requirements, I would have excused her. . . . It's almost as if I'm being forced to keep a juror because [Medrano's attorney] wants a juror of a particular race. I don't know if it's because he is from a particular race and feels he's going to have a connection with that juror. I think that's an inappropriate reason. But I am not going to be bullied into selecting a juror which I would normally kick for these reasons just because counsel is *Wheeler*ing me—if that's the term to use— from the very beginning, from the very first challenge as to Hispanics and as to African-Americans, though they've excused Hispanics themselves. . . . I don't want a juror that's going to be hesitant and that's going to be the juror that hangs the case after months and months of this case."

Defense counsel replied that Juror No. 5475 had not said that the prosecution "absolutely had to prove," she had said that she would have to be "absolutely convinced." The trial court interjected, "She said it would have to be absolutely correct." Defense counsel then stated that this was the "standard that a juror should apply."

The court found the challenge to Juror No. 5475 to be race neutral without making further remarks.

Medrano contends that the prosecutor mischaracterized Juror No. 5475's answers in that she made clear several times that she could and would follow the reasonable doubt standard. Medrano cites the holding in *People v. Silva* (2001) 25 Cal.4th 345, 376-377, 385 (*Silva*) as one that should govern this case.

In *Silva*, the prosecutor argued that Juror Jose M. (hereinafter, "M.") would be reluctant to return a death verdict and was an extremely aggressive person who might hang the jury on the question of penalty. (*Silva*, *supra*, 25 Cal.4th at pp. 376 & 385.) There was nothing in M.'s voir dire that supported either assertion, even remotely; in fact, M. had stated he could return the death penalty. (*Id*. at pp. 376-377.) The trial judge appears to have said absolutely nothing about M., except to state that "'good excuse'" had been given for three peremptory challenges which included that asserted against M. (*Id*. at p. 382.) The Supreme Court concluded: "We find nothing in the trial court's remarks indicating it was aware of, or attached any significance to, the obvious gap between the prosecutor's claimed reasons for exercising a peremptory challenge against M. and the facts as disclosed by the transcripts of M.'s voir dire responses. On this record, we are unable to conclude that the trial court met its obligations to make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' [citation] and to clearly express its findings [citation]." (*Id.* at p. 385.)

In the case at bar, the prosecution stated at one point that Juror No. 5475 said that the prosecution is required to absolutely *prove* the crime. When defense counsel argued that Juror No. 5475 had *not* said that the prosecution was absolutely required to *prove* the crime, the trial court interrupted with almost surgical precision to state that Juror No.

21

5475 had said that her decision would have to be *absolutely correct*. The defense then stated that this was the correct standard for a juror to employ.

While Juror No. 5475 had actually used "sure of" and not "correct," it is clear enough that the trial court had not only been listening very closely and attentively, the court had also zeroed in on the dispositive fact. The dispositive word that sent the prosecutor's alarm bells ringing was, of course, the word "absolutely." Quite unlike in *Silva*, the trial court in this case was right on the cutting edge of the matter.

It is also true that in *Silva* there was a complete disconnect between what the prospective juror and the prosecutor said. In this case, however, the prosecutor's rather lengthy explanation of the challenge centered on the perceived danger that Juror No. 5474 required absolute certainty in reaching her conclusions. That is certainly something that No. 5474 had clearly enunciated.

The foregoing answers the claim that the prosecutor mischaracterized what Juror No. 5475 said. It is true that the prosecutor quoted her as saying that the prosecution had to absolutely *prove* its case. The trial court, however, knew better and corrected the record. Thus, even if there was an attempt to mischaracterize the record, it failed. In any event, we are not persuaded that the prosecutor tried to mislead the court. It is clear that the prosecutor's concern was that Juror No. 5475 required a higher standard of proof than the one that actually governs. The prosecutor may have been mistaken in his reading of Juror No. 5475. But, mistaken or not, this was not evidence of group bias.

(6) Prospective Juror No. 9613

Juror No. 9613, a Hispanic female, lived in San Fernando, worked in retail and had no prior jury experience. Her husband was a landscaper who "got a DUI" about 15 years earlier, but she had no opinion at all on how he was dealt with by the court system. No other family or friend had been charged with a crime or had been a victim. She could be fair to both sides. She understood the presumption of innocence to mean: "Innocent until proven guilty." She thought she would be able to "tak[e] that on" determining the credibility of witnesses, but did not "think it would be easy." Although it had not

22

happened to her before, it was possible that she would not be able to make an important decision.

The court ruled that a prima facie case of group bias had not been shown, as far as Juror No. 9613 was concerned. Nonetheless, the trial court invited the prosecutor to explain the challenge, which the prosecutor proceeded to do:

"With this particular juror, I don't know if it was [Aleman's counsel] or [Medrano's counsel] that was asking her questions. She was very receptive to that if there is not evidence, then she is going to vote not guilty. She actually came up with a term, innocent until proven guilty. It's the manner [in] which she said it. Many jurors have not made that so vocal, innocent until proven guilty. I think she has a strong opinion and she caught on to certain instructions that the court read that I don't know if any other juror caught on to . . . . I think this is a juror that may cause some problems for me when she deliberates because she will be opinionated."

He added, "She's already focusing on certain instructions. She knows that it's innocent until proven guilty. And—and when she was talking about her job, it was not clear that she had a quick response as to what it is that she does for a living. I'm always mindful when someone doesn't want to say I don't know—she did not immediately say what she does for a living, but the bottom line is I think she's a person with a strong opinion that's going to look and try to figure this case out beyond the evidence that I may have and she is someone that has—was very adamant in responses to the defense as to voting not guilty, innocent until proven guilty. And what else did I have? Whether or not, you know, one witness would be sufficient or not."

"So this is a witness that—it's not based on race; it's based on her demeanor, her response to me. She is not a good juror for the prosecution which has nothing to do with race. And there are other Hispanic jurors right now on the jury, Juror No. 4, 9351, Juror No. 6, 8996, Juror No. 8, 7573, Juror No. 9. I'm not sure what his background is. Half the venire in this jury appears to be Hispanic, also.

"So those are my reasons for excusing Juror 9613."

23

The court agreed with the prosecutor's assessment of this prospective juror: "Court does find the reasons to be race neutral, quite frankly, from either side. I think she is very young. I think she is very opinionated. And I think she is a person that could present issues on either side depending on how she went back, she does seem to have a forceful personality. And at this point in time, she will be excused, and next peremptory would be with the defense."[4]

Medrano contends that the prosecutor's statement that Juror No. 9613 "actually came up with a term, innocent until proven guilty" is inherently implausible since the trial court and at least 10 prospective jurors used the same term.

It is, of course, impossible to know exactly what the prosecutor meant by this remark. Medrano seems to think that the prosecutor was saying that, *unlike other prospective jurors*, Juror No. 9613 knew the phrase innocent until proven guilty. However, it is obvious that the prosecutor was not referring to other jurors. It is more plausible to think that the prosecutor meant to say that Juror No. 9613 was quick to volunteer the phrase. The prosecutor's next observation, that "[s]he's already focusing on certain instructions. She knows that it's innocent until proven guilty" seems to confirm that the prosecutor thought that Juror No. 9613 was too strongly focused on this presumption. In fact, the record shows that the prosecutor asked Juror No. 9613 a series of specific questions about the innocent until proven guilty presumption which indicates that Juror No. 9613's understanding of the presumption was of concern to the prosecutor.

A prospective juror's interpretation of the innocence presumption is, of course, of great interest to a prosecutor. Also, a prosecutor's interest in a prospective juror's understanding of this concept is also very *legitimate* since a wrong view of this presumption can scuttle a criminal prosecution.

---

**4** "Once the trial court ruled on the credibility of the prosecutor's stated reasons, the issue of whether the defense had made a prima showing became moot." (*People v. Jurado* (2006) 38 Cal.4th 72, 104.)

Medrano contends that the prosecutor's *and the trial court's* conclusions that Juror No. 9613 was very opinionated is "completely unsupported by anything in the record."

We frequently draw conclusions about the character traits of our fellow men or women by indications that will appear in no paper record. That is one reason why the standard of review on *Wheeler/Batson* issues is deferential. Since a reading of Juror No. 9613's measure of confidence in her own opinions was evidently based on her deportment (which, of course, is not transcribed), it is striking that the trial judge, who was clearly a very alert listener, went out of her way to pick up on the one character trait that seemed to perturb the prosecutor.

The challenge to Juror No. 9613 was race neutral.

## 2. <u>Admission of a Letter Referring to Drug Distribution</u>

The court admitted a February 2011 letter written by a deputy district attorney to a judge in a different case, regarding a probation hearing for prosecution witness Sabino Cabral (the Letter). The Letter states that Cabral is a material witness in the case against Aleman and Medrano, and was recently convicted in Arizona, in violation of his California probation. It continues, "Mr. Cabral testified at the preliminary hearing as a witness for the prosecution . . . . His testimony detailed the inner workings of a drug distribution ring and the murder of a motorist on the 101 freeway. He has put himself at great personal risk by cooperating in this murder prosecution. [¶] To our knowledge he has not received leniency for his cooperation to date."

Aleman's attorney asked the court for permission to introduce the Letter because "it is relevant and material with respect to [Cabral's] credibility." The prosecution asked the court "to exclude" the Letter under Evidence Code section 352, because it was pure speculation that Cabral received any kind of benefit. Aleman's counsel countered that the Letter is "something the jury can consider in determining [Cabral's] credibility and whether he's benefiting from being a witness in this case," i.e., the jury could infer that Cabral falsely testified against defendants to avoid being sent to prison for a probation violation. Medrano's counsel chimed in, "the jury is entitled to know how many benefits he's receiving." The court allowed the defense to introduce the Letter, because it is

25

relevant to whether Cabral sought to benefit from his cooperation with the prosecution, and specifically noted that Cabral could be questioned about his conviction for transporting drugs in Arizona.

Without referring to the Letter, the prosecutor asked Cabral on direct examination if he was aware that someone wrote on his behalf or whether he was promised "a better deal" following his Arizona drug conviction if he testified against defendants; Cabral denied it. The defense specifically asked Cabral about the Letter.

The court found the Letter "more probative than prejudicial," rejecting defense requests to redact the "drug ring" and the "great personal risk" language because "it would leave the jury to speculate as to what was being hidden and that there is really juicy stuff crossed out that was going to the judge." The court said it "cautioned counsel about the language in the Letter," yet "defense counsel chose to go into the Letter and to allow the jury to just get partial representation would be inappropriate."

On questioning by Medrano's counsel, Cabral denied receiving leniency and denied that he testified about a drug distribution ring, causing defense counsel to ask if the Letter is "a lie" adding, "You've never in your life detailed or testified about the inner workings of a drug distribution ring . . . yet when the prosecutor asked you about it, you seemed to agree with it, correct?" When Cabral answered "yes," defense counsel said, "That's a dang lie. That statement is a lie because you've never done that, have you?" Cabral replied, "No."

After defense counsel repeatedly accused Cabral of being a liar, the prosecution read portions of the preliminary hearing transcript, in which Cabral agreed that he "'engage[d] in a business'" with defendants, which involved "'weed, drugs'" and "'transporting marijuana.'"[5] Defense counsel again asked to redact the Letter, or for a limiting instruction. The court replied that the defense had already questioned Cabral about working for a drug organization and accused him of lying about his preliminary

---

[5]    Cabral was arrested in Arizona while transporting 240 pounds of marijuana, with an assault rifle in the trunk of his car.

26

hearing testimony.  "So that being the case," the court concluded, "the D.A. was allowed to go into it," adding, to Aleman's counsel, "If you want to get together a limiting instruction, Mr. Pitman, I will be happy to review it."

Defendants argue that admitting the Letter was an abuse of discretion.  (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)  The argument fails, because defendants *insisted* on using the Letter, over prosecution objections.[6]  The invited error doctrine is designed to prevent an accused from gaining a reversal on appeal based on a trial court ruling made at the defendant's behest, when defense counsel acts for tactical reasons.  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.)  Defense counsel used the Letter for tactical reasons, to undermine Cabral's credibility by implying that he benefitted from his cooperation with the district attorney's office to obtain leniency in another case.  If there was an error, defense counsel invited it by actively seeking to introduce the Letter at trial.

Compounding matters, when defense counsel grilled Cabral about the Letter's statement that he provided testimony about a "drug ring," Cabral denied giving such testimony.  Defense counsel paved the way for rebuttal by the prosecutor, who read aloud preliminary hearing testimony in which Cabral admitted to transporting drugs on behalf of defendants.  Rebuttal evidence is relevant and admissible "'to disprove a fact of consequence on which the defendant has introduced evidence.'"  (*People v. Clark* (2011) 52 Cal.4th 856, 936.)

A declarant's statement "'"offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief . . . is not hearsay, since it is the hearer's reaction to the

---

[6]    As the trial court noted, "the Letter was first brought to the court's attention by the defense.  It was the defense motion to introduce the Letter to impeach Mr. Cabral and to show that he was being given a benefit . . . by the district's attorney's office for his testimony.  The People objected to the introduction of the Letter.  And over their objection, I allowed the Letter to come in."  The record belies defendants' current disavowal of responsibility for convincing the trial court to introduce the Letter.

statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement.'"'" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162.) The Letter was not introduced for the truth of the matters stated in it. Rather, defendants used it to impeach Cabral, to show his reaction to the district attorney's purported offer of a "sweet deal"—lenient treatment in exchange for his testimony against defendants. Despite the court's invitation "to get together a limiting instruction," defendants failed to do so.

The Letter was not testimonial evidence that was prepared for purposes of painting defendants as drug dealers. It is a business record in an entirely different matter, and the district attorney's office objected to its use (by defendants, for impeachment) in this case. The prosecution did not expect to use the Letter or create it for the "primary purpose" of proving a fact at defendants' trial. (*People v. Cage* (2007) 40 Cal.4th 965, 984; *Crawford v. Washington* (2004) 541 U.S. 36, 51-52; *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 324.) As the Letter was not testimonial evidence offered for the truth of the matters stated in it, its admission does not violate the Sixth Amendment's confrontation clause. The confrontation clause allows the use of such evidence for nonhearsay purposes. (*Cage,* at p. 975, fn. 6.)

Once defendants convinced the trial court to introduce the Letter, the court properly found that all of it was admissible under the doctrine of completeness. When part of a writing is given in evidence by a party, "the whole on the same subject may be inquired into by an adverse party." (Evid. Code, § 356.) Defendants introduced the Letter to show that Cabral was lying to obtain leniency. Part of the Letter concerned Cabral's preliminary hearing testimony about his job as defendants' drug runner, which has a direct bearing on the subject of the Letter, i.e., leniency for Cabral in a probation violation proceeding following his conviction for transporting drugs in Arizona. (See *People v. Harris* (2005) 37 Cal.4th 310, 334-335.) Cabral testified that Aleman arranged for him to transport drugs from Arizona and was driving behind Cabral but did not get pulled over. Further, Medrano was recorded bragging that "I'm a drug dealer." The trial court correctly determined that the Letter was more probative than prejudicial. (Evid. Code, § 352.) Its admission did not transform this murder trial into a drug trial.

28

**3. Evidence Code Section 1101**

Evidence of a person's character or trait, as shown by specific instances of conduct, "is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) By the same token, nothing prohibits admission of evidence that a person committed a crime, civil wrong or other act "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident[)] . . . other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).) Nothing affects the admissibility of evidence offered to support or attack the credibility of a witness. (Evid. Code, § 1101, subd. (c).)

a. *Drug Rivalry Evidence*

The prosecution's theory was that Aleman and the victims were rival drug dealers. Defendants objected to the admission of evidence showing that Macias was a rival drug dealer. The trial court sustained the objections and barred introduction of evidence regarding Macias's occupation. The court agreed with defendants that drug-related evidence was more prejudicial than probative.

As the trial progressed, defendants demanded to use the Letter to impeach Sabino Cabral, leading to questioning about Cabral's involvement in a "drug ring." Medrano's counsel cross-examined Cabral on the issue of drug crews and his transportation of drugs. In response, the prosecution asked Cabral about his preliminary hearing testimony regarding his drug business with defendants. Defendants complain that the testimony regarding drug dealing was inadmissible character evidence that they engaged in uncharged misconduct to prove their criminal disposition or propensity to commit the crimes charged.

As discussed in section 2, *ante*, the drug ring evidence was elicited when defendants tried to impeach Cabral's credibility, by demonstrating that he received a benefit for testifying against defendants. The purpose was to show that Cabral lied to satisfy the prosecution's demands by fingering defendants, not to show that defendants have a bad character or propensity for criminality. The evidence also shows that Cabral

29

hung out with defendants for a particular reason; it explains his initial lies to investigating officers about the shootings, owing to his extensive involvement with defendants; and it sheds light on Cabral's fear that his testimony "could cost me my life" and he could "get killed" for it.

There was no direct evidence admitted of a drug ring rivalry between defendants and the victims, only that they "had a beef" or engaged in altercations. No one proved that the victims were drug dealers, so the "beef" could have been anything—a family dispute, or disrespectful behavior. Even if the jury inferred that the beef was a drug distribution rivalry, it went toward proving a motive for the seemingly unprovoked shootings, while the unarmed victims were driving down the road.

Proof of a simmering dispute between defendants and the victims shows motive or the absence of a mistake or accident. (Evid. Code, § 1101, subd. (b).) ""'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.'"" (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.) For example, gang evidence is admissible if it is a relatively minor component of the prosecution's case, and is not unduly inflammatory because it did not emphasize the general violent nature of gang activity or suggest that the defendant's gang membership predisposed him to violent crimes. (*Id.* at p. 656; *People v. Martin* (1994) 23 Cal.App.4th 76, 81 [even prejudicial evidence of gang activity can be introduced to show motive].) Here, most of the drug crew evidence was elicited by the defense; it was a minor component of the prosecution's case given the abundant eyewitness testimony, and it did not suggest that drug sales generally disposed defendants to commit violent crimes.

b. *Aleman's Possession of a Nine-Millimeter Gun*

Christina Noriega saw a nine-millimeter semiautomatic gun in the glove compartment of Aleman's car in May 2008, three months after the Iriarte shooting and seven months before the Macias shooting. Aleman contends that the trial court improperly overruled his objection under Evidence Code section 1101 that this evidence showed bad character and criminal propensities, while failing to prove that the weapon

was used in either of the shootings. The court found the evidence more probative than prejudicial because it showed that Aleman "had the access and opportunity to have this type of weapon" to commit both shootings.

Nine-millimeter guns were used in both the Iriarte and Macias shootings, which were committed from vehicles in which Aleman was either driving or a passenger. It is relevant that a nine-millimeter gun was seen in Aleman's glove compartment in between the two shootings. Evidence that Aleman possessed a weapon in his car a few months after a crime, coupled with evidence that this type of weapon was used in two crimes, tends to establish that he perpetrated the crimes, and it "does not matter that the prosecution could not conclusively connect defendant's [weapon] to the [ ] crime scene." (*People v. Farnam* (2002) 28 Cal.4th 107, 156-157.) Aleman's possession of a nine-millimeter gun in his car shows opportunity, intent, preparation, or a plan to shoot people from cars. The probative value of this evidence outweighs its prejudice and does not violate Aleman's due process rights. (*Ibid.*)

c. *Lack of Sua Sponte Limiting Instruction*

Aleman argues that the trial court should have instructed the jury how to consider evidence about his running a drug ring and his possession of a firearm. (CALCRIM No. 375.)[7] Trial counsel did not request the instruction, even after the trial court invited them to submit one with respect to the drug ring testimony. There is no requirement that the trial court instruct the jury on uncharged offenses without a defense request, except in an "'extraordinary case'" where the past offense "is a dominant part of the evidence," is "highly prejudicial and minimally relevant," and past offense evidence is "so obviously important to the case that *sua sponte* instruction would be needed to protect the defendant." (*People v. Collie* (1981) 30 Cal.3d 43, 63-64; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1094.)

---

**7**     The prosecution requested CALCRIM No. 375. After Medrano objected to the instruction, the trial court refused it.

This is not an extraordinary case. Evidence of a gun seen in a glove compartment or a drug ring was not the focal point of the prosecution's case. This evidence did not affect the outcome, given the compelling evidence of guilt.

As to the Iriarte shooting, Aleman's girlfriend told police that two to three shots were fired near her head and she saw Aleman with a gun in his hand. Minutes later, Aleman was pulled over by police investigating a report of a shooting from a white Escalade. They found the gun and spent bullet casings near Aleman's seat. In the Macias murder, eyewitnesses, cell phone records, and a photograph placed Aleman at the festival and the shooting sites. Aleman directed Cabral to return to the freeway to see what happened to Macias's car, and asked a girlfriend to research whether the police had named a suspect, inferably so that he could flee and avoid arrest. Two days later, Medrano publicly bragged that "he had done the shooting" of Macias, prompting Aleman to tell Medrano to keep quiet about the criminal act they committed.

A different outcome would not have been obtained, even with CALCRIM No. 375. Counsel may have had sound tactical reasons not to want the jury to receive an instruction that begins with the words "Evidence of Uncharged Offense," when Aleman was already charged with eight offenses. Trial counsel's failure to request the instruction was not inadequate representation.

## 4. **Flight Instruction**

The court gave a modified flight instruction.[8] The jury may consider evidence of a defendant's flight "immediately after the commission of a crime, or after he is accused of a crime that has been committed" because it may show awareness of his guilt, though it cannot prove guilt by itself. (§ 1127c; CALCRIM No. 372.) Aleman opposed the instruction, because "there is no evidence of flight."

---

**8** "If the defendant fled or tried to flee, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

"'An instruction on flight is properly given if the jury could reasonably infer that the defendant's flight reflected consciousness of guilt, and flight requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.'" (*People v. Visciotti* (1992) 2 Cal.4th 1, 60.) A flight instruction may be given if a defendant remains at home after committing a murder, until after the body is found and "suspicion had focused on him." (*People v. Howard* (2008) 42 Cal.4th 1000, 1021.) There is no need to prove that defendant was aware of criminal charges against him, as a prerequisite for the flight instruction. (*People v. Abilez* (2007) 41 Cal.4th 472, 523.)

Defendants fled the scenes of the Iriarte and Macias shootings immediately after the crimes. This justifies a flight instruction because it shows consciousness of guilt— defendants wanted to avoid observation or arrest. (*People v. Avila* (2009) 46 Cal.4th 680, 710.) Further, after Cabral was arrested, law enforcement officers began conducting surveillance on Aleman, prompting him to stay in hotels. While being tailed, he fled toward Mexico. Aleman's decision to flee when law enforcement attention was focused on him shows consciousness of guilt.

Aleman contends that the trial court improperly rewrote the jury instruction, omitting the statutory language that flight occurred "immediately after" the crime is committed or the defendant is accused of the crime. The Bench Notes to CALCRIM No. 372 indicate that the trial court should omit the "immediately after" language if flight occurs later. The Supreme Court has held that when flight occurs, for example, after an escape from jail, it is properly admissible as indicating consciousness of guilt, in which case "it would have been preferable had the trial court *deleted* any reference in the instruction to flight 'immediately after the commission of a crime.'" (*People v. Carrera* (1989) 49 Cal.3d 291, 313-314, italics added. See also *People v. Farley* (1996) 45 Cal.App.4th 1697, 1712-1713 [it was error to include the "immediately after" language when the defendant fled much later, but the error in including "the irrelevant language" was harmless because it did not lower the burden of proof].) The court in this case could

properly delete the "immediately after" parenthetical language from the instruction, as recommended in the *Carrera* and *Farley* opinions.

## 5. A Witness's Refusal to Testify

In its opening statement, the prosecution referred to the prospective testimony of witness Gina Acosta. When Acosta was called to the stand, she answered a few preliminary questions, then refused to testify further though the testimony would not incriminate her, she had immunity, and the court ordered her to testify. The court struck Acosta's very limited testimony when she refused to testify despite having immunity. The court rejected a defense instruction that the jury should "disregard that [Acosta] was called as a witness."

Aleman contends that his right to a fair trial was compromised because the prosecution was allowed to ask Acosta questions, which she refused to answer.[9] A witness cannot be compelled to invoke the Fifth Amendment in front of the jury, nor can the prosecution argue negative inferences about it. (*People v. Morgain* (2009) 177 Cal.App.4th 454, 466.) But if the witness has immunity—and no constitutional right to refuse to testify—the prosecutor may urge the jury to draw adverse inferences without violating the defendant's confrontation or due process rights. (*Id.* at pp. 467-468.) The court struck Acosta's testimony and the questions asked of her. We must presume that the jury followed the court's instructions and ignored the questions. (*People v. Doolin* (2009) 45 Cal.4th 390, 444.) By the same token, the court correctly refused to instruct the jury to disregard that Acosta was called to the witness stand, allowing "her unjustified refusal to answer the prosecutor's questions [to] remain[ ] before the jury." (*Morgain*, at

---

[9]     For example, she was asked, "Did you tell Detective Tennelle that Michael Aleman had admitted to you what happened on December 12, 2008, the day of the shooting?" Some questions put to Acosta concerned her fear of testifying and the consequences of disobeying the order to testify. During opening argument, the prosecution told jurors that Acosta would be fearful and uncooperative, but would testify that Aleman told her about the shooting at Alameda and Cesar Chavez, how they chased Macias onto the freeway, shot at Macias, and saw his car crash.

p. 468; *People v. Lopez* (1990) 71 Cal.App.4th 1550, 1554 ["Jurors are *entitled* to draw a negative inference when such a witness refuses to provide relevant testimony"].)

## 6. Accomplice Instruction

Defendants asked the trial court to instruct the jury that immunized witness Sabino Cabral was an accomplice to both shootings. They reasoned that Cabral was in Aleman's car when Iriarte was shot. Also, Cabral followed Aleman onto the 101 freeway before the Macias shooting, then returned to the crime scene, at Aleman's request. The prosecution disputed that Cabral was an accomplice. The court denied the instruction.

When there is evidence that a witness is an accomplice, his testimony is viewed with suspicion because an accomplice may try to shift blame to the defendant in an effort to minimize his own culpability in the hope of leniency or immunity. (*People v. Wallin* (1948) 32 Cal.2d 803, 808; *People v. Frye* (1998) 18 Cal.4th 894, 967.) Defendants had to establish by a preponderance of the evidence that Cabral is an accomplice. (*People v. Fauber* (1992) 2 Cal.4th 792, 834; *People v. Snyder* (2003) 112 Cal.App.4th 1200, 1219.)

An accomplice is one subject to prosecution for the identical crime as the defendant because he (1) personally committed the crime; or (2) knew of the criminal purpose of the person who committed the crime; AND (3) intended to and did in fact aid, facilitate, promote, encourage or instigate the crime or participate in a criminal conspiracy to commit the crime. (§ 1111; CALCRIM No. 334; *People v. Hayes* (1999) 21 Cal.4th 1211, 1271, fn. 19.)

Defendants did not carry their burden of showing that Cabral is an accomplice. During the Iriarte shooting, Cabral, one of six passengers in the car, was highly intoxicated and asleep on the floor behind the second row of seats, where he had no access to the gun police found in the front console.[10] Cabral testified, without contradiction, that he was unaware of the shooting until awakened by police sirens. No

---

[10]    Aleman concedes as much: his opening brief reads, "Cabral slept through [the] Montebello shooting."

35

evidence supports a finding that Cabral facilitated, promoted, encouraged or instigated the shooting of Iriarte.

On the night of the Macias shooting, Cabral drove to the festival with the Moreno siblings, and was as frightened as they were, falling to the ground then running away when shooting broke out at the intersection of Alameda and Cesar Chavez. Although he drove within sight of Medrano's truck on the freeway, there is no proof that Cabral aided, facilitated, promoted, encouraged or instigated the shooting on the freeway. Returning to the shooting site to see what happened, 20 minutes later, does not make Cabral an accomplice to murder. No evidence was produced that would make Cabral liable for either shooting. Mere presence at a crime scene, without more, makes someone an eyewitness, not an accomplice. (*People v. Richardson* (2008) 43 Cal.4th 959, 1024-1025.)

In any event, the failure to give an accomplice instruction "is deemed harmless where there was ample evidence corroborating the witness's testimony." (*People v. Arias*, *supra*, 13 Cal.4th at p. 143.) Laura Nunez stated that a gun was fired so close to her head that her ears were numb, and she saw Aleman with a gun in his hand: no one accused Cabral of being the shooter. Eyewitnesses saw defendants (in particular Aleman) standing on the street corner, shooting at Macias in the Bentley. The Morenos did not see a Cabral with a gun at any point. Though Cabral hung out with defendants, nothing shows that he developed a plan with them to shoot either victim.

**7. The Gun in the Storage Unit**

Aleman makes two claims with respect to a police search of a storage unit in July 2009, which turned up a nine-millimeter gun, ammunition, and his driver's license. First, he argues that the resulting charge of being a felon in possession of a firearm (count 7) should have been severed. Next, he argues that his conviction on count 7 is not supported by substantial evidence.

At trial, Aleman argued that count 7 was unconnected to the rest of the case and tended to show that he is the type of person who owns guns, while conceding that he faced two other counts of being a felon in possession of a firearm. The court found that

36

all three charges were of the same class and unlikely to inflame or prejudice the jury. Aleman later renewed his request to sever count 7, but the court found that the evidence recovered from the storage unit is relevant and admissible with respect to the other charges.

The state Constitution condones the joining of criminal cases:  joinder or consolidation promotes efficiency and is not error unless prejudice is clearly shown. (Cal. Const., art. I, § 30, subd. (a); *People v. Scott* (2011) 52 Cal.4th 452, 469.)  A defendant may be charged with "two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts," though the trial court has discretion to separately try counts in the interests of justice and for good cause. (§ 954.)  When two or more offenses of the same class of crimes or offenses are charged, evidence concerning one offense need not be admissible as to the other offenses in order to be tried before the same jury.  (§ 954.1.)

Aleman was charged with being a felon in possession of a firearm (former § 12021) on three dates:  the February 2008 shooting, the December 2008 shooting, and the July 2009 storage unit search (counts 5, 6, and 7).  The charges are the same class of crime and so, by statute, can be tried before one jury.  Count 7 was relevant to show that Aleman had access to nine-millimeter weapons and ammunition, the type used in both shootings.  The cross-admissibility of the evidence in count 7 dispels any suggestion of prejudice and justifies the trial court's refusal to sever charges.  (*People v. Soper* (2009) 45 Cal.4th 759, 774-775.)

Count 7 did not need to be severed owing to the potential prejudice of inflaming a jury.  (*People v. Soper*, *supra*, 45 Cal.4th at p. 780; *People v. Marquez* (1992) 1 Cal.4th 553, 572-573 [the joinder of two unrelated murder charges is not inflammatory].) Investigators' discovery of a gun and ammunition in a storage unit is far less damaging to Aleman than the charges that he was involved in unprovoked shootings that killed one person and nearly killed another.

37

Substantial evidence supports Aleman's conviction on count 7. The storage unit contained a fully loaded unregistered revolver wrapped in a knit cap; an empty gun case, holster and magazine for a nine-millimeter Glock; nine-millimeter Winchester bullets; bullets for a nine-millimeter Luger; expended nine-millimeter CCI casings; a long rifle; rifle cartridges; cell phones; and Aleman's phone bills, expired driver's license and a photograph of him. A receipt for the unit was found in his car when he was arrested.

Though Aleman's father was peripherally connected to the storage unit, he testified that he did not sign the lease. He denied knowing what type of property was stored in the unit. He was listed on the lease as an alternate tenant who could be reached in an emergency. He was in Mexico when the unit was leased in April 2009, and learned of it after the police search, when he received a call from the storage company. Aleman, Sr., testified that "I didn't have the keys" to the unit. The jury could readily find that the gun found in the storage unit belonged to defendant Aleman.

## 8. Aleman's Conviction for Shooting at Macias

Aleman argues that no credible evidence proves beyond a reasonable doubt that he was a shooter in the Bentley incident. The basis for his claim is that Cabral "is the consummate liar" and "no reasonable jury . . . could have believed the immunized Cabral's inherently improbable and inconsistent testimony."

Cabral acknowledged that he initially lied to the police when asked about the Macias shooting: he did not want to get involved because "it could cost me my life" if he told police what he saw, and he could "probably get killed" for his testimony. At trial, Cabral was inconsistent and evasive. He was cross-examined for days by defense counsel in an effort to destroy his credibility. Aleman lists the attacks on Cabral's credibility in his brief. Cabral admitted at trial that he cooperated with the police to avoid being charged with Macias's murder and spend the rest of his life in prison.

Despite defendants' best efforts to crush Cabral, the jury elected to believe his testimony against friends that he saw almost daily in 2008. The jury was informed that Cabral had immunity, but was not protected from a perjury charge. Owing to the Letter defendants used for impeachment, the jury knew that Cabral may have received leniency

38

for his testimony, and was involved in a drug distribution ring. The defense missed no opportunity to paint Cabral as a criminal unworthy of credence; they were not prevented from mounting a defense. As Aleman concedes, credibility is decided by the jury. (*People v. Friend* (2009) 47 Cal.4th 1, 41 ["'it is not a proper appellate function to reassess the credibility of the witnesses'"].)

Cabral's testimony is not "incredible," as Aleman claims. It is bolstered by independent eyewitness Ocampo, who saw two men—one resembling Aleman—firing guns at a Bentley. The Morenos saw defendants argue with the Bentley driver, then heard gunshots. No gun was found in the Bentley. The jury reasonably concluded that defendants fired weapons. Nine-millimeter Winchester bullet casings were found on the street and nine-millimeter CCI casings were found on the freeway, the same type that Aleman kept at his storage unit, along with an empty gun case and magazine for a nine-millimeter gun.

A woman who dated Aleman stated that Aleman's group had conflicts with Macias, providing a motive. On the day of the shooting, Aleman asked a friend to check whether the police had named any suspects. After Cabral was arrested, Aleman stayed in hotels then fled, showing consciousness of guilt. If, as Aleman wishes, the trial court had admitted more evidence showing that Cabral was a gangster and drug trafficker, it would not have benefitted Aleman, who spent nearly every day with Cabral in 2008 and hired him to transport drugs, points that reflected poorly on Aleman.

**9. Jury Question**

The jury sent the trial court a note regarding count 1 (murder) and count 3 (shooting at an occupied motor vehicle).[11] It read, "We need clarification on the murder counts for both defendants. The language in the counts both state that the defendant 'personally . . .' fired a firearm. Would we then find both guilty of first-degree murder, count 1, even if one was aiding/abetting?" The court was required to respond to the question. (§ 1138.)

---

[11]    Aleman accepts the answer to the second question, so we do not address it.

39

The defense felt that the court should simply refer the jury to the first degree murder instruction, CALCRIM No. 521. The court instead gave an answer offered by the prosecution: "The murder counts do not state that a defendant must 'personally fire' a firearm. The theories for first degree murder are in instruction No. 521. A defendant may be found guilty of first degree murder under either theory stated in instruction No. 521 as a principal or aider and abettor. The firearm enhancements under Penal Code sections 12022.53(b), 12022.53(c), 12022.53(d), and 12022.5(a) require that a defendant 'personally' use or discharge a firearm."

Aleman contends that the response to the jury question "specifically emphasized the firearm enhancements [and] was tantamount to a directed verdict." We disagree. The court restated that defendants could be found guilty of murder as either a principal or aider and abettor, directing the jury's attention to the applicable jury instruction. It reiterated that the firearm use enhancement does not apply unless a defendant "personally" discharged the gun. The court did not direct a verdict by observing that the murder charge itself (unlike the enhancement) does not require a defendant to personally fire a weapon.

## 10. Separate Punishment for the Attempted Murder of Macias

Aleman challenges his sentence for both the attempted murder of Macias (count 2) and the murder of Macias (count 1). He maintains that the attempted murder conviction is a lesser included offense to murder, barring conviction or punishment for both crimes. (§§ 654, 954; *In re Adams* (1975) 14 Cal.3d 629, 633-635.)[12]

Multiple punishments are not permitted "for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294; § 654.) Section 654 applies when there is "a single act committed against a single victim." (*People v. Atkins* (1997) 56 Cal.App.4th 331, 338.) Multiple punishment is permitted when the criminal acts

---

[12] In his reply, Aleman states that his arguments are "subsumed in, and controlled by . . . section 654." (See *People v. Correa* (2012) 54 Cal.4th 331, 336-337.)

40

forming the basis for convictions of multiple offenses are divisible—the acts were "consecutive even if similar." (*People v. Britt* (2004) 32 Cal.4th 944, 952.)

Under section 654, "a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment." (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.) "This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935; *People v. Andra* (2007) 156 Cal.App.4th 638, 640.) The trial court has broad latitude to decide whether section 654 applies to a series of offenses, and its determination will be upheld if supported by substantial evidence. (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113; *People v. Osband* (1996) 13 Cal.4th 622, 730-731; *People v. Vang* (2010) 184 Cal.App.4th 912, 915-916.)

The attempted murder was distinct from the murder. The first was committed when Aleman was standing on a street corner near a crowded religious festival. He fired through the passenger window of Macias's vehicle, endangering nearby festivalgoers, apart from Macias. After failing in the attempt, Aleman proceeded on foot to a parked vehicle. During this period, Aleman had ample opportunity to reflect and to renew his intent. He could have directed Medrano to drive in the opposite direction from the victim. Sometime later, two miles from the first shooting, defendants fired repeatedly at Macias on the freeway, endangering the lives of motorists in the vicinity, a new aggravation of public security. In light of the temporal and physical separation between the attempt and the murder, and the multiple dangers posed to the public, this was not a "single act" or an "indivisible course of conduct." It was two different events, and Aleman was properly punished for both of them, commensurate with his culpability.

## 11. Cumulative Error

Defendants assert that they were deprived of a fair trial and there was a miscarriage of justice owing to cumulative error. They characterize this as a "close case." The jury began deliberations late in the day on January 15 and reached a verdict at

noon on January 18. Far from showing a difficult or close case, the jury's resolution of a three-month trial in three days is attributable to the overwhelming evidence of guilt.

Aleman shot at and nearly killed Iriarte with a bullet that passed inches from Iriarte's heart. Iriarte told police that a white SUV was driving nearby when the shots were fired. A passenger in Aleman's Escalade conceded that Aleman may have been firing over her head at Iriarte and told police that she saw Aleman with a gun, putting it near the center console. The police received a 911 call reporting gunshots fired from a white Escalade. They stopped Aleman's car minutes later and found the gun near the center console, along with expended bullet casings. Iriarte had problems with defendants in the past, and had gone to El Rodeo nightclub with his friend, Jose Macias, who was on bad terms with defendants.

Ten months after the Iriarte shooting, an independent eyewitness saw Aleman, wearing a gray hooded sweatshirt, firing a gun into a Bentley. Two eyewitnesses heard defendants argue or exchange words with the Bentley driver just before the shooting. Aleman was photographed at a nearby religious festival that evening, wearing a gray hooded sweatshirt. Eyewitness Cabral saw muzzle flashes coming from Medrano's car just before the Bentley crashed on the freeway; soon after, he was enlisted by Aleman to drive back to the shooting site to see what happened. Mobile phone records support the testimony. Aleman also had a friend check to see if police had named any suspects in the shooting. Two days afterward, Medrano boasted of shooting Macias and Aleman told Medrano to shut up. Defendants "had a beef" with Macias before the shooting.

In short, even if errors were made at trial, the errors were harmless in light of compelling evidence that defendants committed the crimes of which they were convicted.

## DISPOSITION

The judgments are affirmed.

CERTIFIED FOR PUBLICATION.

BOREN, P.J.

We concur:

CHAVEZ, J.                    HOFFSTADT, J.

42